# REDACTED PUBLIC VERSION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEARCEY JAMES STEWART,<br><br>Petitioner,<br><br>vs.<br><br><br>MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation,<br><br>Respondent. | Civil No. 05cv1059-BTM (CAB)<br><br>**ORDER:**<br>**(1)  DIRECTING THAT MATERIALS SUBMITTED FOR IN CAMERA REVIEW BE FILED UNDER SEAL;**<br><br>**(2)  DENYING PETITIONER'S REQUEST FOR DISCOVERY;**<br><br>**(3)  DISMISSING FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS AS UNTIMELY; AND**<br><br>**(4)  ISSUING A CERTIFICATE OF APPEALABILITY** |

Petitioner is a state prisoner proceeding pro se with a First Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego County Superior Court conviction of two counts of attempted murder.  (Doc. No. 55.)  Petitioner alleges the prosecutor committed misconduct and failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963) and Giglio v. United States, 405 U.S. 150, 154 (1972), and that the Court can reach the merits of his claims irrespective of any procedural bar because he can satisfy the "actual innocence" standard set forth in Schlup v. Delo, 513 U.S. 298, 315 (1995) (holding that a claim of actual innocence which depends on the validity of ineffective assistance of counsel and Brady claims is not itself a constitutional claim, but is "a gateway

though which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.")

In its May 30, 2008 Order, the Court found that this action is untimely because it was filed after expiration of the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1). (See 5/30/08 Order [Doc. No. 54] at 8-11.)  The Court found that Petitioner was not entitled to statutory or equitable tolling, but reserved ruling on whether he could satisfy the Schlup standard until after consideration of his discovery motion.  (Id. at 11-18.)  As detailed in that Order and more thoroughly below, Petitioner was convicted of driving the vehicle from which his co-defendant Richard Lee was convicted of shooting the Parish brothers.  (Id. at 2-3.)  Because Petitioner and Lee were both identified by the Parish brothers, and Lee's conviction was later overturned due to newly discovered evidence, the Court reserved ruling on Petitioner's Schlup claim until after it reviewed the evidence relied upon by the San Diego County District Attorney in deciding not to oppose Lee's state habeas petition.  (Id. at 15-18.)

The Court expanded the record to include the response to an order to show cause filed in Lee's state habeas case wherein the District Attorney did not oppose granting habeas relief to Lee.  (See 1/21/09 Order [Doc. No. 68] at 1-4.)  The Court directed Respondent to submit for in camera review all documents upon which the District Attorney based the decision not to oppose Lee's habeas petition, as well as any material which cast doubt on the eyewitness identifications made by the Parish brothers, and reserved ruling on Petitioner's request for discovery of that material pending an in camera review.  (Id. at 4-6.)  After Respondent submitted the requested material for in camera review, the Court granted Petitioner's Motion to Expand the Record and Motion to Supplement the First Amended Petition to include several declarations, his own, one from fellow prisoner and associate of one of the victims Maurice League, one from Richard Lee and one from Petitioner's attorney, all without prejudice to Respondent's authenticity, credibility and relevancy objections. (Doc. Nos. 80, 84.)

## I.      Request for Discovery

The Court has reviewed the documents submitted by Respondent and finds, for the reasons set forth below, that Petitioner has not satisfied the Schlup standard.  Petitioner is

05cv1059

therefore not entitled to discovery of these materials under Rule 6(a) of the Rules Governing Section 2254 Cases, which provide that "discovery is available only in the discretion of the court and for good cause shown." Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999); see also Cooper v. Brown, 510 U.S. 870, 877-79 (9th Cir. 2007) (finding district court acted within its discretion in denying discovery under Rule 6(a) where it would not satisfy the Schlup standard). For purposes of appellate review, the Court **DIRECTS** the Clerk to file under seal the in camera material submitted by Respondent.

Petitioner contends that, in addition to seeking discovery under the habeas rules, he has a post-conviction due process right to this information under Brady, as that right has been interpreted by the Ninth Circuit in Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992) and Osborne v. District Attorney, 521 F.3d 1118, 1128-29 (9th Cir. 2008), reversed by District Attorney v. Osborne, 557 U.S. ___, 129 S.Ct. 2308 (2009). (Pet.'s Reply [Doc. No. 66] at 2.) In Osborne, the Ninth Circuit found a limited constitutional right to post-conviction access to physical evidence in order to conduct DNA testing which was not available at the time of a prisoner's trial. Osborne, 521 F.3d at 1128-29. The Supreme Court reversed, finding that there is no such constitutional right, rejected the holding in Osborne and Goldsmith that Brady applies in such a situation, and reiterated that federal due process is not violated unless the state court procedures for access to such evidence "'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" Osborne, 129 S.Ct. at 2319-20, quoting Medina v. California, 505 U.S. 437, 446 (1992). Petitioner has made no such showing regarding California's procedures. Osborne, 129 S.Ct. at 2321 ("[I]t is Osborne's burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief.") Even if he could make such a showing, Petitioner does not seek evidence that would exonerate him. Unlike Osborne, where new and more sophisticated DNA testing methods had been developed since the defendant's trial and had the potential to prove his innocence, Petitioner is merely seeking discovery of the District Attorney's files which, for the reasons set forth below, do not exonerate him.

Petitioner's reliance on Goldsmith is similarly unavailing.  The Court in Goldsmith held that a respondent to a federal habeas petition has an obligation to either turn over exculpatory semen evidence or inform the district court that no such evidence exists.  Goldsmith, 979 F.2d at 749-50.  Petitioner here is not seeking physical evidence capable of exonerating him.  Rather, he is seeking access to the District Attorney's file which, for the reasons set forth below, does not exonerate him.  In any case, the holding in Goldsmith that Brady applied in such a situation was specifically rejected by the United States Supreme Court in Osborne.  Osborne, 129 S.Ct. at 2319-20.

## II.      Petitioner has not satisfied the Schlup standard

"In order to pass through *Schlup's* gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2003), quoting Schlup, 513 U.S. at 327.  In applying this standard, "'[a] petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that '"a court cannot have confidence in the outcome of the trial."'"  Majoy, 296 F.3d at 776, quoting Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting Schlup, 513 U.S. at 316.  For the following reasons, Petitioner has not satisfied this standard, even in light of the materials submitted by Respondent for in camera review.

### a)  Procedural background

Petitioner was convicted on April 12, 1996, after a joint trial, of two counts of attempted murder as the driver of a car from which his co-defendant Richard Charles Lee was found to have shot two brothers, Mark and Michael Parish.  Petitioner is currently serving two life sentences plus seven years in state prison.  Lee obtained habeas relief from the trial court on August 31, 2000, several months after his and Petitioner's direct appeal ended.  (Pet. [Doc. No. 1] Ex. E, In re Lee, No. HC16243 (Cal. Sup. Ct. Aug. 31, 2000).)  The People did not oppose Lee's habeas petition, but "conceded that there appears to be newly discovered evidence which is sufficiently credible to cast doubt on the integrity of [Lee's] convictions." (Id. at 1.)  A letter

dated July 14, 1998, sent by the District Attorney to Lee's attorney, states that the District Attorney had received third-hand information regarding Lee which was being disclosed pursuant to <u>Brady</u>.  (Traverse [Doc. No. 31] Ex. A.)  In that letter, the District Attorney informed Lee's counsel that Darnell Jackson, through his attorney, had approached the District Attorney with an offer of proof regarding information that Jackson had "about certain unsolved cases."  (<u>Id.</u>)  The letter states that Jackson informed the District Attorney that Petitioner and Arnold Adkins were the people who shot the Parish brothers, that Jackson had "described for his attorney the facts of how and where the Parish brothers were shot," that Jackson's "statements were consistent with the police reports with the exception of Adkins being identified as one of the shooters instead of Lee," and states that Adkins was recently deceased.  (<u>Id.</u>)  The letter reports that Jackson made the following statement:

> Jackson stated that Richard Lee was in fact involved in a shooting that same day, but not the shooting of the Parish brothers.  Jackson told his attorney that Richard Lee met up with Adkins and [Petitioner] at Anthony Reilly's house after the shooting of the Parish brothers.  Jackson stated that Lee came from a car function at Martin Luther King Park.  Jackson reportedly told his attorney that when Adkins and [Petitioner] told Lee about the Parish brothers shooting, Lee became excited and wanted to do a shooting also.  Jackson stated that the group was aware of a party in Emerald Hills so they went there to do a shooting.  They saw a group and parked 1/2 block away, Lee walked up to the group and fired several rounds into the crowd and then fled back to the car.  Jackson stated that the person killed was named "Gee Wiz."  I checked with SDPD homicide detectives and there was a person with the moniker Gee Wiz killed about one hour after the Parish brothers shooting.

(<u>Id.</u>)

Petitioner, through counsel, filed his own state habeas petition on May 10, 2002.  (Lodgment No. 12 at 13.)  Petitioner alleged in that petition that Lee's attorney had conducted an investigation based on the information contained in the July 14, 1998 letter, and had discovered that Jackson was also an informant in another case regarding Skyline gang members, that Jackson was in the witness protection program and unavailable, and that Lee's attorney had obtained declarations from individuals from the Skyline area corroborating Jackson's statement that Adkins had shot the Parish brothers.  (<u>Id.</u> at 13-14.)  Those declarations are attached to the Traverse (Doc. No. 31) as Exhibits B-D.

/ / /

Petitioner's counsel indicated in the state habeas petition that he had conducted his own investigation based on the information provided in Lee's habeas case, and had received a letter from Roy Vinson, Adkins's uncle, "advising me that he had information that petitioner had been wrongly convicted in the shooting of the Parish brothers in case no. SCD 116366. Mr. Vinson advised me that Darnell Jackson was the driver of the vehicle from which Arnold Adkins had shot the Parish brothers." (Id. at 5-6.) Counsel also stated that he had been contacted by Arnold Johnson, a cousin of Adkins, on June 10, 2001, who "informed me that at the funeral of Arnold Adkins, Darnell Jackson admitted to being the driver of the vehicle used in the shooting of the Parish brothers. Mr. Johnson further informed me that Arnold Adkins had also informed him of that fact in late 1996." (Id. at 6.) Finally, counsel stated that "Shortly after obtaining the declaration of Arnold Johnson, I was informed of a former girlfriend of Darnell Jackson, one Tatianna Daniels who had made statements to others that Darnell Jackson had personally confessed to his involvement in the shooting of the Parish brothers. [¶] I spent many months attempting to get in contact with 'Tatianna,' known to me only by that name." (Id.) Petitioner presents the declarations of Vinson, Johnson and Daniels here just as they were presented to the state courts. (Pet. [Doc. No. 1] Exs. A-C.)

The state trial court issued an order to show cause in Petitioner's habeas action, and the District Attorney responded with evidence that Vinson, Johnson and Daniels had provided prior inconsistent statements regarding Jackson's involvement in the Parish brothers shooting, were all associated with the same gang to which Petitioner belonged, the Skyline Pirus, and that Vinson and Johnson had been convicted of multiple felonies and were serving life sentences. (Lodgment No. 14.) The appellate court denied relief on the basis that "the 'newly discovered' evidence presented herein is clearly insufficient to support a conclusion that points unerringly to Petitioner's innocence." (Lodgment No. 16, In re Stewart, No. HC 17038, slip op. at 3 (Cal. Sup. Ct. Dec. 17, 2002).) The court found that "the evidence is not credible because of inherent inaccuracies and witness bias. Moreover, it does not completely undermine the prosecution's case or point unerringly to Petitioner's innocence, and the evidence includes inadmissible hearsay." (Id.) The appellate court denied a subsequent habeas petition in a four-page order in

which the appellate court agreed with the conclusions of the trial judge regarding the reliability of the Vinson, Johnson and Daniels declarations and the inadmissibility of the hearsay contained therein, and concluded that: "The declarations at best raise an issue of credibility without providing a complete defense." (Lodgment No. 18, In re Stewart, No. D041599, slip op. at 3-4 (Cal.App.Ct. May 23, 2003.)  The state supreme court summarily denied a subsequent habeas petition presenting the same claims.  (Lodgment Nos. 19-20.)

Petitioner alleges in the First Amended Petition here that the prosecutor committed misconduct and violated Brady and Giglio by:  (1) failing to disclose a statement by William Allen, Petitioner's friend and fellow gang member, which impeached Kevin Brown, a friend and former member of one of the Parish brothers; (2) presenting perjured testimony of the Parish brothers; and (3) failing to disclose evidence bearing on the credibility of the Parish brothers, including the evidence provided by Darnell Jackson as well as any and all information obtained during the investigation leading to the non-opposition to Lee's state habeas petition.  (First Amended Petition "FAP" [Doc. No. 55] at 6-8d.)  Because this action was initiated after the statute of limitations expired (see 5/30/08 Order at 8-18), the Court can only reach the merits of Petitioner's claims if he can satisfy the Schlup standard.

Petitioner claims that he can satisfy the Schlup standard because it is unlikely that any reasonable juror would convict him if they knew that: (a) the Parish brothers misidentified Lee; (b) Jackson had information regarding the details of the shooting that only a participant would have; (c) Jackson was known to drive a rust-colored vehicle similar to the one identified as being involved not only in the shooting of the Parish brothers but also in another shooting involving Michael Parish a few months later; (d) Jackson admitted to Daniels and Johnson that he drove the car during the shooting of the Parish brothers; (e) Jackson was in possession of the .357 revolver used in the shooting; (f) Jackson was in the company of Adkins the day of the shooting; and (g) Jackson admitted to being in the group, along with Adkins, that committed the murder of Gee Wiz.  (FAP at 9-9h.)  Petitioner requests an evidentiary hearing on his Schlup claim, contending that the Court must make credibility determinations regarding the people who have provided the various statements and declarations.  (Id. at 9e-9g.)  He seeks discovery of the

District Attorney's file, contending it may contain information which shows that Jackson was the driver of the car from which the Parish brothers were shot, and/or shows that the misidentification of Lee by the Parish brothers was the result of pressure or perjury.

The Court will first review the evidence presented at Petitioner's trial, including evidence ruled inadmissible.  See Schlup, 513 U.S. at 327-28 (noting that a federal habeas court  may consider relevant evidence that was either excluded or unavailable at trial.)  The Court will then address whether Petitioner can, in light of the information contained in the District Attorney's file and the post-conviction declarations he has obtained, "persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  Id. at 329.[1]

**b) Trial Evidence**

Mark Parish testified at trial that he was at one time an associate of the Emerald Hills street gang, and that his brother Michael was a member of that gang.  (Lodgment No. 2, Reporter's Tr. ["RT"] at  343.)  Mark testified that the Skyline Pirus are a rival gang, and that the intersection of Skyline Drive and Meadowbrook in San Diego is in the heart of the Pirus' territory.  (RT 289-93.)  Mark stated that at about 6:00 p.m. on September 23, 1995, he was a passenger in a "real fancy" green Impala driven and owned by Michael.  (RT 507-08.)  They had just left Martin Luther King Park and were on their way to a party in Mission Valley, and along the way they planned to stop at Sylvester Wade's house, a San Diego Police Detective who is married to their sister, to pick up their niece to take her to the party.  (RT 507-10.)  They traveled down Skyline Drive and were stopped at a traffic light at the intersection with Meadowbrook when Mark observed Petitioner, Richard Lee and Anthony Reilly standing next to a BMW.  (RT 508-15.)  Reilly said "Skyline Piru" and made a hand gesture which Mark recognized as a Piru gang sign meaning the Parish brothers did not belong in the area.  (RT 514-16.)

---

[1]  With respect to the declarations submitted by Petitioner in support of his Schlup claim, "the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"  House v. Bell, 547 U.S. 518, 537 (2006), quoting Schlup, 513 U.S. at 331-32.

Mark described the BMW at trial as four-door, brownish rust-colored, with tinted windows and Enkei rims, which he said were distinctive custom rims sold by BMW, and identified it from a photograph at trial of a BMW owned by Petitioner's mother. (RT 296, 527, 529, 535.) Mark testified that he also thought the BMW was a silver-gray color, and explained that he had given different descriptions of its color due to its unusual paint job which he said seems to have different colors depending on how the light hits it. (RT 536, 563-64, 627.) The trial judge stated that the color of the BMW in the photograph was "a little hard to describe." (RT 579.) When shown two paint samples from a BMW dealer, one depicting a brown/copper color and the other the actual color of Petitioner's mother's BMW, Mark chose the later as the color of the BMW he saw that day. (RT 580-81, 587-88.)

Mark testified that when the light turned green Michael made a left-hand turn on Meadowbrook, and they were proceeding northbound at about 35 miles per hour when the BMW they had just seen pulled alongside them traveling at the same speed. (RT 525-27, 530.) The front passenger window of the BMW, which was next to the front driver's side of the Impala, was rolled down, as was the driver's side window of the Impala. (RT 527-28.) Mark could see that Petitioner was driving the BMW and Lee was in the front passenger seat. (Id.) Mark saw Lee point a handgun at their heads from about eight feet away. (RT 529-30.) Mark thought at first the handgun was a nine-millimeter semiautomatic, and initially described it that way to the police, but had since become convinced that it was a .357 revolver because no shell casings were found at the scene. (RT 531, 649.) Mark heard a total of six shots, and was looking right at Lee when the first bullet entered Mark's right shoulder and exited his chest, and he told Michael he was hit. (RT 531-32.) Michael pushed him down as Mark heard five more shots in quick succession and saw Michael get hit. (RT 532-33.) Mark looked up and saw the BMW speed away. (RT 534-35.)

They drove to Detective Wade's house where Wade contacted the San Diego Police Department on a C-band radio and requested paramedics. (RT 543-45.) Soon there were police cars, paramedics and news reporters at the house, and Mark gave a brief statement to Wade while lying on a gurney. (RT 546-48.) Mark described the car to Wade as a silver-grayish, four-

1  door BMW with tinted windows and Enkei rims, and said that he knew who had shot him or that

2  he had seen them before.  (RT 548.)  He described the driver to Wade as a light-skinned Black

3  male, 18-21 years old, with short hair, a goatee and wearing a ball cap.  (RT 560-61.)  Mark

4  described the shooter to Wade as a short, bald, 18 year-old, dark-complected Black male.  (RT

5  561-63.)  Mark gave a statement to a police officer in the ambulance on the way to the hospital

6  while he was falling asleep, but did not do so willingly due to concerns about being labeled a

7  snitch, which he described as someone who handles things in the courts rather than on the street.

8  (RT 345, 551-53.)  While on the way to the hospital, Mark described the driver as a bald, Black

9  male with a goatee wearing a baseball cap, but testified at trial that the driver had his hair pulled

10 back in a ponytail and it just looked like he was bald.  (RT 553-54.)

11      Mark was discharged from the hospital after about an hour, and provided a physical

12 description of the driver and shooter to Wade during the discharge procedure.  (RT 559-64.)

13 Mark later received a page and telephoned the sender, who was from Skyline.  (RT 565.)  The

14 person who paged Mark told Mark who had driven the car and who had shot him, and Mark

15 passed that information on to his brother and to Detective Wade.  (RT566, 571.)  Mark testified

16 that he was not returning any calls after the shooting because he did not want to speak to anyone

17 about it, but he returned this particular page because "my friend had just got murdered . . . so I

18 was concerned."  (RT 676.)  Mark said he later identified Petitioner, Lee and the BMW from

19 photographic lineups shown to him by Detective Wade.  (RT 574-75.)

20      Michael Parish testified consistently with Mark's testimony regarding his gang

21 membership and the sequence of events on the day of the shooting.  (RT 706-14.)  Michael

22 testified that he was driving his green Impala and they were stopped at the intersection of

23 Meadowbrook and Skyline when he saw several people standing next to a brownish, rust-colored

24 BMW give them a Piru gang sign.  (RT 714.)  He identified Petitioner and Lee in court as two

25 of the men, and Anthony Reilly from a photograph as the third.  (RT 716-17.)  Michael said he

26 knew Reilly because Reilly had a baby with Michael's ex-wife's sister, and said the three men

27 were standing in front of Reilly's house.  (RT 716-17, 721.)  A short time later the same BMW

28 pulled alongside Michael's car; he identified Petitioner in court as the driver and Lee as the

passenger. (RT 722-24.) Michael looked straight into their faces and Lee opened fire with a handgun. (RT 724-25.) Michael pushed his brother down after the first shot, and then felt himself hit in the back with the second shot. (RT 725-26.) He activated the driver's side hydraulic lift on the car, which raised his side of the car, and he heard the rest of the shots hit the car. (RT 727.) He sped off driving on the wrong side of the road for a time and eventually made it to his sister's house where his brother-in-law Detective Wade called for help. (RT 731-33.) He could not remember if he answered any questions from the police that night, other than giving a physical description of the car and the men to Wade, because he was in so much pain. (RT 734-36.) Michael said that the color of the BMW was difficult to describe but that the car had distinctive rims. (RT 735, 739.) At trial, when shown two paint samples from a BMW dealer, one which depicted the actual color of Petitioner's mother's BMW and the other a brown/copper color, Michael chose the actual color of the BMW, and said it looked more like what he considers to be rust-colored. (RT 754.) Michael identified Petitioner, Lee and the BMW from photographic lineups shown to him by Wade a few days after the shooting. (RT 741-42.)

A police officer working with the Gang Suppression Unit testified that Petitioner was contacted in an unrelated matter on June 6, 1995, and that he was driving the BMW which the Parish brothers had identified in court, which the officer described in his report as silver. (RT 294-96.) Petitioner was contacted by the same officer on June 29, 1995, driving the same car, which the officer described in his report as gray, and Petitioner told the officer he was a member of the Skyline Pirus. (RT 299-301.) Michael Sturdivant testified that he was driving southbound on Meadowbrook about 6:30 p.m. on September 23, 1995, when he saw a gray or white BMW, or perhaps a Nissan Sentra, which he said looks the same as a BMW, traveling fast and swerving in and out of traffic coming in the opposite direction. (RT 830-33.) A second car, a green Impala, was behind the BMW driving on the wrong side of the road. (RT 836.)

Michael Cole testified that he lived on Meadowbrook and was at home the day of the shooting, and that about 6:30 p.m. he heard a gunshot, a pause, and four or five more shots in rapid succession. (RT 850-53.) He looked up and saw a shiny, light-colored, possibly gray car

drive away, and he called 911. (RT 854-55.)  No evidence of the shooting or bullet casings were found at the scene, which led the police to believe a revolver had been used.  (RT 901-02.)  A police officer who rode in the ambulance with Mark testified that he was uncooperative and did not want to answer specific questions.  (RT 932.)  Mark told the officer that two men in a gray BMW shot at them with a nine millimeter handgun, and although he did not know who they were he thought they were from Skyline.  (RT 934-36.)  A different police officer testified that Petitioner was contacted by police about midnight on the night of the shooting, sitting in and cleaning the BMW which the trial witnesses had identified, which was parked, backed-in, in a stall in the apartment complex where he lived.  (RT 968-69.)

Sylvester Wade, a San Diego Police Detective assigned to the Street Gang Unit, testified that he is married to the Parish brothers' sister, but that he has had very little contact with the Parish brothers because "they are both gangsters and I'm a police detective" and therefore cannot associate with them, and that he and the two brothers are "totally different sets of people, like night and day."  (RT 992-93.)  When the Parish brothers came to his house after being shot Michael looked as if he was about to pass out, so Wade slapped him in the face and told him to tell what had happened.  (RT 994-98.)  Michael said they had been shot by some guys from Skyline, that he did not know who they were but that he had seen them before, and that they were driving a rust-colored BMW.  (RT 998.)  Wade testified that Mark interrupted Michael at that point and said "nah, it was like a light bluish or grayish," and Michael said "yeah, it was like a light silver-grayish or light-blue colored BMW."  (RT 998-99.)  Michael told Wade that the driver was a Black male, about 18 to 20 years old, light-complected with a possible mustache and goatee.  (RT 999.)  He described the shooter as a Black male, about 18 to 20 years old, medium-skinned complection with a possible goatee.  (Id.)

Wade took a full statement from Mark at the hospital.  Mark told him they were on their way to Wade's house when they passed a bunch of Skyline guys standing next to a light blue or grayish-colored BMW with distinctive rims who threw a gang sign. (RT 1004-05.)  They turned north on Meadowbrook but the BMW soon pulled alongside Michael's side of the car, and the passenger put a handgun out the window and shot them.  (RT 1005.)  Mark described the driver

as a Black male, about 18 to 20 years old, light-complected with a mustache and goatee, and said he had seen him before. (RT 1006.) He described the shooter as a Black male, about 18 or 20, short hair and a possible goatee. (Id.) Later that evening Wade was assigned to investigate the case by his sergeant, an assignment he did not ask for and was neutral about. (RT 1007.)

Wade interviewed Michael at the hospital two days later and took a full statement. (RT 1010-11.) Michael said that they were on their way to Wade's house when they saw several guys from Skyline standing in front of Anthony Reilly's house give a gang sign as they passed. (RT 1011-12.) They continued driving towards Wade's house when the silver-grayish or light bluish BMW with tinted windows and distinctive rims which the Skyline guys had been standing next to pulled up alongside the driver's side of Michael's car. (RT 1012-13.) Michael described the driver as a Black male, 18 to 20 years old, light completed, with short hair and possibly a mustache and goatee. (RT 1013.) He said he had seen the driver before but they had never had any problems, and said that someone had called him while he was in the hospital and told him the driver's gang moniker was "P-Du." (RT 1013-14.) Michael described the shooter as a Black male, 18 to 20 years old, medium-skinned complexion with a goatee and perhaps a pony tail, whom he had also seen around before, and whose gang moniker he was told by the person who called him at the hospital was "Puff" or "Pufferoo." (RT 1014.) Michael said he was in front of someone's house about ten days after he was shot, when a drive-by shooting took place. (RT 779.) He described the vehicle used in that shooting as a four-door, rust-colored Honda with dark-tinted rear windows driven by a Black male. (RT 780-82.)

Police gang files indicated that P-Du was a gang moniker for Petitioner, and that Pufferoo was a moniker for Richard Lee. (RT 1015-16.) Wade obtained their photographs from gang files and prepared photographic lineups from which Mark and Michael identified Petitioner as the driver, Lee as the shooter, and Petitioner's BMW as the vehicle used in the shooting. (RT 1017-34, 1061.) Petitioner was arrested on October 6, 1995, and Lee was arrested ten days later. (RT 1038.) Lee ran from the officers during his arrest and brandished a stolen, loaded nine millimeter handgun which he threw away when shot at by the police. (RT 1352-54, 1384-90, 1444-46.) Several months later a police officer escorted Mark Parish along the route he traveled

-13-

on the day of the shooting, taking photographs, and when they were at the intersection of Skyline and Meadowbrook in front of Anthony Reilly's house, Reilly came outside. (RT 1214-20.) The officer told Reilly to walk away, but Reilly approached the car, looked at Mark through the window, and yelled: "Oh, a snitch." (RT 1221-27.)

Petitioner's mother testified that the BMW identified by the witnesses in photographs at trial belonged to her, and that Petitioner was driving it in September of 1995, and had been for about four months. (RT 1127-28.) She also owned a four-door Honda Accord which she said looked similar to the BMW. (RT 1508-09, 1917.) She testified that she was contacted by the police around midnight on September 23, 1995, at which time her BMW was parked in a stall in the parking lot of her apartment complex. (RT 1130-31.) She told the police that night that she had seen a BMW in the Skyline area around 6:30 p.m. that day that at first looked like her car, but that on closer examination she decided was not her car. (RT 1134-35, 1140.) She testified that she did not see Petitioner in the Skyline area around 6:30 p.m. that day, and denied that she had told a police officer that night that she had seen Petitioner in the Skyline area around that time. (RT 1131-32.) A police officer testified that he spoke with Petitioner's mother that night and that she told him that she had seen Petitioner in the Skyline area around 6:00 p.m. that evening. (RT 1155-56.) Gunshot residue was found on the roof of Petitioner's mother's BMW. (RT 1281-84.)

Kevin Brown testified that he was appearing at trial reluctantly, under subpoena, and in fear for his life. (RT 1302, 1314.) Brown said that he grew up in Emerald Hills, knows the Parish brothers, is a former member of the Emerald Hills gang, and has one felony conviction on his record. (RT 1288, 1296.) Sometime after the shooting, Petitioner, whom Brown had never met before, showed up at Brown's football practice at Grossmont College and spoke to a person named Will who lived in the Skyline area and was on the football team. (RT 1291-93.) Petitioner called out to Brown in the parking lot after practice and asked Brown what "set" he claimed, meaning what gang subset Brown belonged to. (RT 1293-96.) Brown was a former member of the Emerald Hills gang and was friends with Michael Parish, and he told Petitioner he was staying in Emerald Hills. (RT 1296, 1304-05.) Petitioner said: "I'm P-Du. I'm from

Skyline. I killed your homeboy," and then said "now what?"  (RT 1297-98.)  Brown assumed Petitioner was referring to the shooting of the Parish brothers and told Petitioner: "I ain't with that," meaning he was not involved in gang activities.  (RT 1298, 1305.)

The People rested and the defense recalled Petitioner's mother, who testified that her BMW had always been the same color and had never been dark or rust-colored.  (RT 1460-61.) She said she drove the BMW to work on the morning of the shooting and did not return home until about 6:00 p.m. (RT 1458-63.) She said she parked the BMW in the apartment lot and left in her other car, and that Petitioner had a key to the BMW.  (RT 1487.)  Kenneth Anderson, who had felony convictions for assault with a firearm and sale of cocaine base and was a member of the Skyline Pirus, testified that he was housed at the George Bailey detention facility in December 1995, after the preliminary hearing but before trial, and that he spoke to Michael Parish, whom he knew, on the telephone from prison in a friendly manner.  (RT 1467-69, 1479, 1741.)  Michael told Anderson that he did not know if Petitioner and Lee had shot him, and that he was getting pressure from his parents and Wade. (RT 1472.) Michael told Anderson that he had identified Petitioner and Lee at the preliminary hearing because people were calling him and telling him that they were the ones who shot him, and because he had become angry at Lee when Lee smiled at him during the preliminary hearing, but that he was not sure of his identification, and that he intended to make things right at trial and tell the truth.  (RT 1473-76.)

Lee's mother testified that Lee came home from Martin Luther King Park very intoxicated between 6:00 and 7:00 p.m. on the night of the shooting, and that he stayed home the rest of that evening. (RT 1564-68.) She admitted that she told the police in January that Lee came home at 7:00 p.m. that evening. (RT 1572.) Lee's younger brother testified that Lee came home intoxicated the night of the shooting between 6:00 and 7:00 p.m. and stayed in the rest of the night. (RT 1578.) A friend of Lee testified that he saw Lee at Martin Luther King Park about 5:30 or 6:00 p.m. on the evening of the shooting and gave him a ride home because he was drunk, dropping him off a few minutes before 7:00 p.m. (RT 1622-28.)

Petitioner's cousin Dion McGee testified that he lived with Petitioner and his mother, that he was in bed with the flu all day on the day of the shooting, and that Petitioner was home all

day until about 7:00 p.m. (RT 1580-85.) McGee admitted that he had previously told detectives that he was asleep from 3:00 p.m. until around 8:00 or 10:00 p.m., and therefore did not see Petitioner during those times. (RT 1593.) A police officer testified that McGee told him that he saw Petitioner leave to go to the store sometime between noon and 3:00 p.m., and that he went to sleep and did not see Petitioner again until about 8:00 p.m. (RT 1752-54.) Petitioner's grandmother testified that she called Petitioner's home and spoke to Petitioner, whose nickname, P-Du, she gave to him at birth, about 6:50 p.m. on the night of the shooting. (RT 1618-19.) Anthony Reilly's mother testified that she was home all day on the day of the shooting and did not see Petitioner's BMW parked in front of her house, and did not see Petitioner or Lee standing in front of the house. (RT 1600-08.) The person who sold the BMW to Petitioner's mother testified that it was a weird, light-greenish color. (RT 1655.) A defense expert testified that the gunshot residue found on Petitioner's car may have had a different source than a firearm, such as a power tool which uses explosive cartridges to sink nails or anchor bolts, and could have been deposited at any time after the last time the car had been washed. (RT 1705-12.) Petitioner's mother testified that she drove to construction sites as part of her job where such power tools were used, although she said she usually drove the Honda and only occasionally the BMW. (RT 1507.)

Due to an evidentiary ruling, the jury did not hear the statement made by Petitioner to the police just after midnight on the night of the shooting when he was found in the BMW. Petitioner told the police: "I live there with my mother and my cousin Dion McGee. I drive my Mom's BMW and she drives the Honda Accord. The only place I went tonight was the Seven-Eleven to get a candy bar, and that was about midnight. When I came back, that's when the cops stopped me. I've been home all day – all day long. I haven't gone anywhere or been with anyone else tonight. My Mom got home around 8:30 tonight. She can vouch for me. My cousin Dion can also vouch for me because I've been with him all day." (RT 1731-36.) Evidence that an Emerald Hills gang member named Greg Brown, whose gang moniker was "Gee Wiz," was shot and killed about an hour after the Parish brothers shooting was ruled inadmissible by the trial judge. (RT 219-20.) The court also excluded the testimony of Jamal Buruss, who told a

police officer that he saw Petitioner driving a gold-colored BMW with two other Black males inside, away from the area where Gee Wiz was killed just after the Gee Wiz shooting.  (RT 217.)

Detective Wade interviewed Lee after his arrest and Lee told him that he had been at Martin Luther King Park on the day of the shooting and left "late at night."  (RT 1791.)  Lee did not say anything about seeing his mother or brother about 7:00 p.m. that night, said he had not hung around P-Du for quite some time, and denied shooting anybody.  (RT 1791-92.)  Lee later called Wade from jail and asked to see Wade, but Wade did not contact Lee.  (RT 1796-97.)

**c)  Analysis**

As set forth above, the information disclosed by the District Attorney to Lee's attorney, and relied on by Petitioner in his own state habeas petition, states that Jackson reported that Lee met up with Petitioner and Arnold Adkins, the actual shooter of the Parish brothers, at Jackson's house shortly after the shooting, that Petitioner and Adkins described the shooting, and upon hearing about it Lee got excited and wanted to do his own shooting.  The group then went to a party where Lee shot into a crowd and an Emerald Hills gang member named Gee Wiz was killed.  The investigation conducted by the District Attorney as reflected in the in camera material supports this version of events.  The only potential the material has to exonerate Petitioner is that it supports a finding that the Parish brothers erred in their identification of Lee, which by implication weakens their identification of Petitioner.  However, as set forth below, the misidentification of Lee can be explained without necessarily calling into question the identification of Petitioner.  Moreover, other than the identification by the Parish brothers, there is no evidence that Lee was the shooter.  On the other hand, there is considerable direct and circumstantial evidence apart from the eyewitness identifications that Petitioner was the driver of the car from which the Parish brothers were shot.

The initial identification by the Parish brothers of Petitioner and Lee resulted from the photographic lineups shown to them by Wade.  However, the lineups were based on the brothers having been told that word on the street was that Petitioner and Lee were the people involved. It appears, however, that the brothers may have been told that Petitioner and Lee were involved in the shooting of Gee Wiz.  Mark testified that after he was shot he was not returning anyone's

calls or pages because he did not want to speak to anyone about the shooting, but that he did return the call from the person who told him that the word on the street was that Petitioner and Lee were involved, because "my friend just got murdered, too, so I was concerned."  (RT 676.) Information that Petitioner and Lee were the persons involved in the killing of Gee Wiz is consistent with Jackson's statement that after Petitioner and Adkins told Lee about the Parish brothers shooting, the entire group went to a party about an hour later where Lee shot into a group of people and an Emerald Hills gang member named Gee Wiz was killed.  [REDACTED– XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXX – REDACTED].  Petitioner has presented declarations from Adkins' uncle and a friend who both state that Adkins admitted to shooting the Parish brothers and that Lee had been wrongfully convicted.  (Traverse Exs. B-C.)

The Parish brothers may have assumed that because word on the street was that Petitioner and Lee had been involved in the Gee Wiz shooting, that they were also involved in their shooting an hour earlier, and identified Lee as the shooter rather than Adkins.  This is consistent with trial evidence that Lee returned to the Skyline area shortly after the shooting of the Parish brothers.  It is also consistent with Jackson's statement that Lee got exited when Petitioner and Adkins told him about the shooting of the Parish brothers, and thereafter committed the murder of Gee Wiz.

Petitioner, unlike Lee, had a weak alibi for the time of the shooting, and several witnesses, including his mother, placed him and his car near the scene of the shooting.  There is additional evidence that Petitioner was also seen driving his BMW away from the scene of the Gee Wiz shooting about an hour later, which is consistent with Jackson's statement.  Thus, the possible confusion between word on the street regarding the shooting of the Parish brothers and the shooting of Gee Wiz may have combined to cause the Parish brothers to identify Lee as the

shooter, which Mark has admitted is possible, but does not call into question the identification of Petitioner as the driver.

Moreover, unlike Petitioner, there is no evidence implicating Lee other than the identification by the Parish brothers.  The only evidence implicating Lee that the prosecutor argued to the jury, other than the identifications by the Parish brothers and the evidence supporting his conviction for assault with a firearm on a peace officer arising from when he brandished a gun when arrested (a charge he was not exonerated on in the state habeas proceeding), was the statement Lee made to a police officer stating that on the night of the shooting he had been at Martin Luther King Park until "late at night."  (RT 1863, 1882-83.) Lee's alibi at trial was that he came home from the park drunk about 7:00 p.m., and the prosecutor and defense counsel disagreed whether 7:00 p.m. constitutes "late at night."  Thus, the trial evidence against Lee, other than the eyewitness identifications by the Parish brothers, was very weak.  Evidence which has come to light after trial tends to exonerate Lee.  This includes Jackson's statement, as well as Adkins' confession to Vinson and Anderson.  In addition, Lee was found to be in possession of a semiautomatic pistol when arrested, rather than the revolver used in the Parish brothers shooting, [REDACTED – XXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX – REDACTED].

On the other hand, a great deal of trial evidence other than the eyewitness identifications implicates Petitioner as the driver.  His alibi witnesses were impeached by prior statements either placing Petitioner in the Skyline area around the time of the shooting or stating that they did not know where he was at that time.  The BMW involved in the shooting was identical to the BMW he drove, which had gunshot residue on it, and Petitioner was found cleaning the car in the middle of the night several hours after the shooting.  The BMW had distinctive rims and was accurately described as a four-door with tinted windows.  There is also evidence not admitted at trial that Petitioner was seen driving away from the scene of the Gee Wiz shooting in a gold-colored BMW about an hour after the Parish brothers shooting, and the likelihood of mistaken identity as to the car is slight.  Although the color of the BMW was at times described as rust-colored by the Parish brothers, they also described its color accurately both at trial and on the

day of the shooting.  Mark chose the actual color of the BMW from a paint swatch at trial, and described the BMW to a police officer in the ambulance as gray and to Wade immediately after the shooting as light bluish or greyish.  Michael indicated that a swatch of the actual color of the car looked more like what he considered to be rust-colored than did a copper/brown factory color swatch.  Moreover, the Parish brothers were not the only ones who had difficulty describing the BMW's color, as even the trial judge commented that the color was difficult to describe, and the person who sold the car to Petitioner's mother said it was a "weird" color.  Petitioner's counsel argued at trial that a dark or rust-colored four-door Honda Accord with tinted windows, similar to the other car which belonged to Petitioner's mother, and which had been described as being involved in a shooting where Michael Parish was present about ten days after he was shot, was involved in the shooting, not Petitioner's BMW.  (RT 1510, 1917-18.)  However, a bystander described a gray or white BMW driving away from the scene of the Parish brothers shooting followed closely by Michael Parish's distinctive green Impala which was being driven wildly.  In addition, the Parish brothers accurately described the distinctive custom BMW rims on Petitioner's car, making it less likely it was confused with a Honda.  Thus, even if Petitioner could attack the eyewitness identification of him as the driver, strong direct and circumstantial evidence places him and his car at the scene of the shooting.

Petitioner presents the Court with the declaration of Maurice League, who states that Mark Parish told him he is not sure who shot him, and that the identifications were a result of pressure.  (Doc. No. 70, Exs. A-B.)  However, similar evidence was presented at trial through the testimony of Kenneth Anderson, who testified that Michael Parish told Anderson that he did not know if Petitioner and Lee had shot him, and that he was getting pressure from his parents and Wade.  (RT 1467-79.)  Thus, the League declaration does very little to lessen confidence in the jury's verdict.  As just discussed, even if the identifications were the result of misunderstood information from the street or from outside pressure, only Lee's identification was affected, and in any case direct and circumstantial evidence independent of the identifications by the Parish brothers implicates Petitioner.

/ / /

Petitioner contends that the prosecution failed to turn over pre-trial evidence consisting of a statement by William Allen, a fellow gang member and friend of Petitioner, impeaching prosecution witness Kevin Brown.  The appellate court found that the prosecution should have turned over a statement by Allen that Petitioner never came to football practice at Grossmont College, which could tend to impeach Brown's testimony that Petitioner came to practice and had been speaking to a person named Will just before he admitted to killing Brown's homeboy. (Lodgment No. 7, People v. Lee, et al., No D026580, slip. op at 12-13 (Cal. App. Ct. Dec. 17, 1998).)  The court found the error to be harmless, however, because "Given the overwhelming direct evidence against [Petitioner], it is not reasonably probable that the outcome of the trial would have been different if Allen, [Petitioner]'s friend and a former member of the same gang, had testified that he had never seen [Petitioner] at Grossmont College." (Id. at 14.)  Moreover, Petitioner's statement to Brown was not necessarily in reference to the non-fatal shooting of the Parish brothers, Brown merely assumed it was.  Although it was apparently made a day or two after the shooting when Michael Parish was still unconscious in the hospital and it was not sure he would live (RT 1305-06), Petitioner may have been referring to the killing of Gee Wiz which took place the same night.  In light of the evidence implicating Petitioner in both shootings, such a minor impeachment of Brown's testimony would not tip the balance towards satisfying the Schlup standard.

In response to Jackson's statements implicating Petitioner as the driver, Petitioner presents the declarations of Vinson, Johnson and Daniels in order to show that Jackson was in fact the driver.  (Pet. [Doc. No. 1] Exs. A-C.)  Vinson states that his nephew Adkins admitted shooting the Parish brothers, that Adkins said one of his close friends was with him during the shooting, and that Vinson knew that Jackson was a close friend of Adkins.  (Id., Ex. A.)  Vinson does not say that Adkins named Jackson as the driver, and although Vinson states that Jackson was at that time in possession of a .357 caliber revolver which he said had been used in a shooting, any implication that Jackson was involved in the shooting is tenuous at best.  Arnold Johnson states that Adkins told him that Jackson and Adkins had been shot at while they were at a nightclub in 1995, that they knew who had shot at them and that they had "taken care of

them," which Adkins said meant that Adkins and Jackson had shot and killed them.  (Id., Ex. B.) Because the Parish brothers were not killed, however, that information is more consistent with impeaching Jackson's statement that he did not take part in the Gee Wiz killing.  Thus, even overlooking the credibility problems noted by the state courts arising from the fact that Vinson and Johnson are associated with the same gang as Petitioner, and have been convicted of multiple felonies and are serving life sentences, they do not help Petitioner satisfy the Schlup standard.

Daniels, however, states that she was Jackson's girlfriend around the time of the shooting, and that Jackson admitted to her that he was driving a red or reddish-brown, four-door Honda from which Adkins shot the Parish brothers.  (Id., Ex. C.)  As set forth above, a bystander described a light colored BMW driving away from the scene followed by Michael's distinctive green Impala, and the jury rejected the argument that a brown or rust-colored Honda was involved.  The Court need not rely on the state court's finding that Daniels lacked credibility, because such testimony is not, in light of all the evidence against Petitioner, sufficient for the Court to "lose confidence in the outcome of the trial."  Schlup, 513 U.S. at 316.

Finally, Petitioner presents his own declaration (his third submitted in this action), along with a declaration from Richard Lee and a declaration from Kenneth Baker, an attorney representing Petitioner in a different matter who obtained the Lee declaration.  (Doc. No. 83, Exs. A- C.)  Lee states that while he was incarcerated as a result of being convicted for shooting the Parish brothers, an unnamed Deputy District Attorney from the San Diego County District Attorney's office visited him in prison "on or about 1999," and said if Lee would agree not to testify at a felony trial involving Mark Smith and Lozier Carter which the Deputy was prosecuting, the Deputy "would sign a declaration that I was innocent based on evidence he had in his possession since 7/97."  (Id., Ex. B at 1-2.)  Lee states that he did not testify in that case, and that his testimony would have served to discredit Jackson, who was a material witness in that case.  (Id. at 2.)  According to Lee, the Deputy District Attorney said he would not disclose the evidence exonerating Lee in the Parish brothers case if Lee testified in the Smith/Carter case. (Id.)  Lee states that he told the Deputy at that time that neither he nor Petitioner were involved

in the Parish brothers shooting, and, although he knows who was involved in that shooting, refused to identify the driver (and apparently continues such refusal to this day).  (Id.)  Baker, in his declaration, states that he interviewed Lee in prison on August 12, 2009, that Lee told him the same story contained in Lee's declaration, and identified the Deputy District Attorney as Michael Groch, the Deputy who wrote the July 14, 1998 letter informing Lee's attorney of the exculpatory information his office had received from Jackson.  (Id., Ex. C at 1.)

Thus, Lee merely indicates that he knows who was involved in the shooting of the Parish brothers but refuses to identify the perpetrators, other than to say it was not him or Petitioner. This is another example of a fellow gang member of Petitioner's willing to state it was not Petitioner who drove the vehicle but unwilling to identify the actual driver.  In any case, Lee cannot have first-hand knowledge of the participants in the shooting of the Parish brothers because he was supposedly at the park at the time of the shooting.  In light of the substantial evidence of Petitioner's involvement as the driver, the Lee and Baker declarations do not tip the Schlup balance in Petitioner's favor.  Lee's allegations against Deputy District Attorney Groch are even less helpful.  It is undisputed that Groch informed Lee's attorney by letter dated July 14, 1998, of the information Jackson had provided exonerating Lee.  According to Lee, however, Groch approached Lee in 1999 with a threat that he would not disclose that information if Lee testified at the Smith/Carter trial.  Because the information Groch allegedly threatened to withhold had already been disclosed, Lee's declaration lacks credibility.  Moreover, Lee's declaration must be taken in light of Lee's history, which includes displaying a gun at the officers who arrested him, for which he was incarcerated at the time of the alleged visit from Groch, as well as his likely involvement in the Gee Wiz killing, along with the fact that Lee waited ten years to come forward with this information.  See House, 547 U.S. at 537 (indicating that the Court "may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" ), quoting Schlup, 513 U.S. at 331-32.  Petitioner states in his own declaration that he believes Lee did not come forward with this information until recently because of pressure by Groch that his office would file charges against Lee for the Gee Wiz murder.  (Doc. No. 83, Ex. A. at 1.)  However, there is no basis for a finding that any

such threat was made, as neither Lee nor Baker mention anything about it in their declarations. Even if Lee would testify that such a threat was made, these declarations provide very little exculpatory value, and, in light of the other evidence, do not tip the <u>Schlup</u> determination in Petitioner's favor.

### d) Evidentiary Hearing

Petitioner requests an evidentiary hearing, contending that <u>Schlup</u> requires a hearing where credibility of witnesses is at issue.  (FAP at 9g, citing <u>Schlup</u>, 513 U.S. at 330.)  In the passage referred to by Petitioner, the <u>Schlup</u> court explained that the "actual innocence gateway" standard is different from the standard governing claims of insufficiency of the evidence, where assessing the credibility of witnesses is generally beyond the scope of review, stating that "under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial.  In such a case, the habeas court may have to make some credibility assessments."  <u>Schlup</u>, 513 U.S. at 330.  As set forth above, the <u>Schlup</u> determination can be made without consideration of the credibility of the witnesses who have provided declarations.  With respect to the trial witnesses, only the credibility of the Parish brothers is potentially at issue.  However, the misidentification of the shooter by the Parish brothers can be explained by their reliance on the "word on the street" as to who shot them.  The brothers' credibility, as least with respect to their identification of Petitioner, has not necessarily been called into question by the new evidence, because their misidentification of Lee can be explained by reasons other than fabrication.  Even to the extent the credibility of the Parish brothers has been called into question by their incorrect identification of Lee, sufficient direct and circumstantial evidence exists independent of their testimony to place Petitioner and his car at the scene of the shooting.  Moreover, while Jackson's statement would exculpate Lee, it further inculpates Petitioner.  For that reason, even assuming the declarations now provided by Petitioner (including the Lee declaration) are credible, and assuming the Parish brother's identification of Petitioner are not credible, the evidence presented by Petitioner has not caused the Court to "lose confidence in the outcome of the trial."  <u>Schlup</u>, 513 U.S. at 316. Accordingly, an evidentiary hearing is not necessary to resolve Petitioner's <u>Schlup</u> claim.

### e) Conclusion

The information provided by Jackson to the District Attorney, and the investigation conducted based on that information, not only directly implicates Petitioner as the driver, but does not call into question the substantial physical and circumstantial evidence presented at trial implicating Petitioner.  Considering all the evidence, which includes the evidence presented at and excluded from the trial, as well as the District Attorney's investigation file and the post-conviction declarations obtained by Petitioner, Petitioner has failed to show that this is one of the "extraordinary" cases where  "a court cannot have confidence in the outcome of the trial." Majoy, 296 F.3d at 776, quoting Schlup, 513 U.S. at 316.

Accordingly, Petitioner has failed to satisfy the Schlup standard.  Therefore, for the reasons set forth in the Court's May 30, 2008 Order, this action is **DISMISSED** as untimely.

### III.    Conclusion and Order

The Court **DIRECTS** the Clerk to file under seal the material submitted in camera by Respondent, and Petitioner's request for discovery of that material is **DENIED**.  This action is **DISMISSED** as untimely for the reasons set forth in the Court's May 30, 2008 Order.  The Court **ISSUES** a Certificate of Appealability as to all claims encompassed in the First Amended Petition.  Lambright v. Stewart, 220 F.3d 1022, 1026 (9th Cir. 2000).

**IT IS SO ORDERED.**

DATED:  April 21, 2010

Honorable Barry Ted Moskowitz
United States District Judge

-25-

05cv1059